UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-60811-GAYLES/STRAUSS

THE ESTATE OF
SAMUEL I. ROIG, *et al.*,

       Plaintiffs,

v.

UNITED PARCEL SERVICE, INC., *et al.*,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court upon Plaintiffs' Motion for Remand ("Motion") [DE 10]. The Motion was referred to me [DE 25] in accordance with 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules for the Southern District of Florida. I have reviewed the Motion and all pertinent portions of the record in this case. For the reasons discussed herein, I **recommend** that the Motion [DE 10] be **DENIED**.[1]

## I.    BACKGROUND

### A.  THE PARTIES

Plaintiffs are the wife, children, and estate of Samuel I. Roig ("Roig"), who passed away in 2016. Plaintiff Gail Olivera ("Olivera") was Roig's wife and is the personal representative of Roig's estate ("Estate"). Plaintiff Kyle Roig ("K.R.") is Roig's adult daughter, and Plaintiff Sam

---

[1] I am issuing a report and recommendation in an abundance of caution, as there is a split of authority (and no binding case) on whether remand motions are dispositive or non-dispositive. *Compare Tejada v. Procter & Gamble Co.*, No. 13-61064-CIV, 2013 WL 12383475, at *1 n.1 (S.D. Fla. July 18, 2013), *and Franklin v. City of Homewood*, No. CIV.A. 07-TMP-006-S, 2007 WL 1804411, at *1-4 (N.D. Ala. June 21, 2007), *with Carl v. Lowe's Home Ctr., L.L.C.*, No. 15-62431-CIV, 2016 WL 11547312, at *1 (S.D. Fla. Apr. 11, 2016).

Roig ("S.R.") is Roig's adult son.  The Estate is being administered in Broward County, Florida.

Plaintiffs are all citizens of the State of Florida.  Complaint ¶ 8.

Defendants are Roig's former employer and superiors.  Roig was employed by Defendant

United Parcel Service, Inc. ("UPS") for over thirty years including when he passed away (while at

work).  *Id.* ¶¶ 15, 106, 108.  Defendant Thomas O'Malley ("O'Malley") was Roig's supervisor at

UPS.  *Id.* ¶¶ 15, 21.  Defendant Romaine Seguin ("Seguin") was O'Malley's boss.  *Id.* ¶ 9.  UPS

is an Ohio corporation with its principal place of business in Atlanta, Georgia [DE 1-3 ¶ 10].

However, O'Malley and Seguin are citizens of the State of Florida (and, thus, not diverse from

Plaintiffs).  Complaint ¶ 9.

### B.  PROCEDURAL BACKGROUND

This is the second lawsuit Plaintiffs have filed against UPS and O'Malley (Seguin was not

a party in the previous case).  The prior lawsuit, which contained many of the same claims, was

also filed in state court and removed to this Court (*see* Case No. 18-cv-61303-UU).  However,

after removal, Plaintiffs voluntarily dismissed the prior case without prejudice.  In February 2019

(approximately 7 months after Plaintiffs voluntarily dismissed the removed case), they attempted

to amend their complaint in the state court case that had previously been removed and voluntarily

dismissed after removal.[2]  Their amended complaint was stricken as void, with a final order of

dismissal subsequently being entered.  The state court's decision was recently affirmed on appeal

[*see* DE 27].

Prior to the state appellate court's affirmance, Plaintiffs filed the instant case in state court.

The case was timely removed to this Court on April 17, 2020.  In the Notice of Removal [DE 1],

---

[2] In their amended complaint, Plaintiffs added various counts and also attempted to add Juan
Vicente ("Vicente"), a human resources manager for UPS, as a defendant.  Vicente is not a
defendant in this case.  However, the Complaint in this case is replete with references to Vicente.

Defendants assert that this Court has jurisdiction under 28 U.S.C. § 1332. Specifically, they assert that the matter in controversy exceeds $75,000 and is between citizens of different states [DE 1 at pp. 2-3]. Though Defendants do not dispute that O'Malley and Seguin are citizens of the State of Florida and non-diverse from Plaintiffs, Defendants contend that O'Malley and Seguin were fraudulently joined as defendants in an attempt to defeat diversity jurisdiction. *See infra* Part II.A (discussing legal standard for fraudulent joinder). Consequently, Defendants argue that this Court must disregard the citizenship of O'Malley and Seguin in determining the existence of diversity jurisdiction [DE 1 at p. 6]. Plaintiffs disagree with the arguments that Defendants raise and contend that this Court lacks subject matter jurisdiction. As a result, they filed the Motion [DE 10], seeking remand to state court. The Motion has been fully briefed and is ripe for review.

### C. COUNTS OF COMPLAINT

The Complaint [DE 1-2] contains nine counts, labeled as follows (the counts germane to the Motion are bolded):

(I)      Violation of the Florida Civil Rights Act – Death Claim;

(II)     Violation of FCRA – Terms and Conditions of Employment;

(III)    Violation of FCRA – Reasonable Accommodation;

**(IV)    Grossly Negligent/Reckless Infliction of Emotional Distress;**

**(V)     Wrongful Death/Survival Act Claim;**

(VI)     Violation of the Whistleblower's Act – § 448.102;

**(VII)   Grossly Negligent/Reckless Infliction of Emotional Distress;**

**(VIII)  Florida Constitution Art. 10, § 24(c) Wages; and**

**(IX)    Florida Constitution Art. 10, § 24(c) Retaliation.**

The Estate is the sole plaintiff in all counts other than Count VII, which was brought by the other plaintiffs (Olivera, K.R., and S.R.). More importantly for fraudulent joinder purposes though, the non-diverse defendants (O'Malley and Seguin) are only named as defendants in Counts IV, V,

VII, VIII, and IX.  While UPS has been named as a defendant in every count, the only counts that are directly relevant to the fraudulent joinder inquiry are the five counts brought against the non-diverse defendants.

### D.  FACTUAL BACKGROUND AND ALLEGATIONS

Roig began working for UPS as a package delivery driver in 1985.  Complaint ¶ 25.  Over time, he rose through the ranks at UPS, being promoted to different managerial and supervisory positions, and receiving recognition from UPS for his job performance.  *See id.* ¶¶ 24-32, 34, 36-46.  Many positions that Roig held at UPS, including the division manager position he was promoted to in 2004, required travel.  *Id.* ¶¶ 36, 42, 45, 46.  In 2004 and the years that followed, UPS required Roig to travel via UPS jump seat in non-ergonomic chairs instead of paying for commercial flights.  *Id.* ¶¶ 47, 50.  In 2013, Roig complained about back pain, but UPS still required him to travel via jump seat.  *Id.* ¶ 50.  Thereafter, Roig sought treatment for his pain and, in February 2014, underwent an MRI, receiving various diagnoses.  *Id.* ¶¶ 51-54.  He also underwent various lower back surgeries.  *Id.* ¶¶ 59-64.

Nevertheless, and although he had difficulty walking, Roig was still required to travel via jump seat, and he had to walk across a gateway ramp and air and hub cargo zones daily.  *Id.* ¶¶ 55-56.  Defendants were aware of Roig's condition, but they denied or ignored his request for an ergonomic chair and a golf cart.  *Id.* ¶¶ 57, 65.  By late 2014, Roig became depressed and binged on alcohol every night to attempt to ease his pain.  *Id.* ¶¶ 69-70.  In March 2015, he was hospitalized for alcohol intoxication.  *Id.* ¶ 74.  O'Malley questioned his alcohol addiction and demanded that he report to work.  *Id.*  At meetings in March and May 2015 between O'Malley and Roig, O'Malley claimed that Roig had attendance and performance issues, which O'Malley noted in Roig's file.  *Id.* ¶¶ 76, 78.  O'Malley told Roig that the attendance and performance issues needed to be resolved

or O'Malley would recommend against a bonus and raise for Roig.  *Id.*  On other occasions, O'Malley commented that Roig was walking too slowly.  *Id.* ¶ 17.  He also made comments regarding Roig shaking from his medication.  *Id.*

In July 2015, Roig celebrated his thirtieth anniversary with UPS and received a certificate signed by Seguin that recognized his thirty years of "dedicated service."  *Id.* ¶¶ 84-85.  Around the same time, he underwent another lower back surgery.  *Id.* ¶ 83.  In August 2015 communications with O'Malley, Roig mentioned his pain and difficulty walking, disputed O'Malley's statement that he was not in pain when he was absent from work, and complained to O'Malley that Defendants wanted to cause Roig's death in the office.  *Id.* ¶¶ 88-91.  Roig also underwent alcoholism detoxification treatment in August 2015, and in late September 2015, Roig was admitted to a thirty-day alcoholism treatment program.  *Id.* ¶¶ 91, 96.  During his time in the treatment program, Roig performed work for UPS by communicating with his staff, which UPS and O'Malley knew.  *Id.* ¶ 97.  However, Plaintiffs allege that Roig received no compensation for the majority of the thirty-day period.  *Id.*

In April 2016, Roig recommended bonuses and raises for the employees on his team, reporting that his division achieved outstanding numbers.  *Id.* ¶¶ 99, 102.  Although the members of his team received bonuses and raises, Roig did not, leaving him "devastated and anguished."  *See id.* ¶¶ 17, 99-106.  On April 26, 2016, after reporting to work, Roig learned from his wife that his paycheck stub did not reflect an increase in salary.  *Id.* ¶ 106.  Later that morning, Roig died in his office from sudden cardiac arrest.  *Id.* ¶ 108.  S.R. identified Roig's body after he was called and informed of Roig's death.  *Id.* ¶ 113.  Later, Olivera viewed Roig's body.  *Id.*  Kyle was told about Roig's death shortly after it occurred.  *Id.* ¶ 19.  Olivera, K.R., and S.R. were all traumatized.

*Id.* ¶¶ 19, 113. K.R., who was a successful collegiate golfer with a promising golf career, struggled with golf following Roig's death (Roig was her caddy). *Id.* ¶¶ 124.

In addition to providing the foregoing background, it is worth noting that the Complaint contains certain allegations concerning UPS's Employee Assistance Program ("EAP"). The general allegations of the Complaint mention that Defendants operated an EAP to protect the mental health, physical health, safety, and well-being of employees and their families. *Id.* ¶ 19. Though the general allegations do not contain any further allegations regarding the EAP, Counts IV, V, and VII also mention the EAP. In Counts IV and VII (emotional distress counts), Plaintiffs allege that Defendants blocked Roig from EAP assistance. *Id.* ¶¶ 141-42, 160. In Count V (wrongful death/survival), Plaintiffs allege that Roig should have been referred to the EAP and that the EAP failed to take control over Roig's mental and physical health. ¶ 147. Notwithstanding the allegations of the Complaint, neither Plaintiffs' Motion nor Reply make any arguments regarding the EAP.

### E. DECLARATIONS

To support their fraudulent joinder contention, Defendants submitted declarations from O'Malley [DE 1-5], Seguin [DE 1-6], and two human resources ("HR") managers (Jennifer Villarreal and Gladys Araujo) [DE 1-3 & 20-1]. In response to Defendants' declarations, Plaintiffs submitted declarations from Olivera, K.R., and their attorneys.[3] K.R.'s declaration details the

---

[3] The attorneys' declarations are not based on personal knowledge (as to the facts of this case) but instead constitute an improper attempt to make further legal argument by impermissibly exceeding the page limits. I have nevertheless reviewed all of the declarations and have considered the state trial court orders submitted by counsel. Very few of the state court orders provided are helpful or persuasive because they are largely, if not entirely, devoid of analysis. *See Lett v. Wells Fargo Bank, N.A.*, No. 14-60434-CIV, 2014 U.S. Dist. LEXIS 191057, at *16 n.6 (S.D. Fla. May 9, 2014) ("The Court respectfully declines to rely on the case law Lett presents allegedly supporting her argument that a manager owes a duty to her employees. The handwritten, form order denying dismissal in [one case] contains no indication of the trial court's reasoning. Similarly, the court in

impact the loss of her father had on her, but it does not set forth facts that contradict (based upon K.R.'s personal knowledge) any non-conclusory material facts set forth in the declarations submitted by Defendants.  Olivera's affidavit, to the extent it does contradict (in a non-conclusory manner) any of the facts from Defendants' declarations that are set forth below (based on personal knowledge), is discussed after relaying those facts.

O'Malley and Seguin state that they have never owned, controlled, or operated the EAP, either individually or as an employee of UPS, and that they have never had control over any employee's engagement of or participation in the EAP [DE 1-5 ¶ 8; DE 1-6 ¶ 9].  They further state that the administration of the EAP is completely independent of their responsibilities at UPS [DE 1-5 ¶ 8; DE 1-6 ¶ 9].  While Olivera's declaration makes the same conclusory duty allegations that are alleged in the Complaint regarding the EAP, it does not contradict O'Malley's and Seguin's statements regarding their separation from the EAP.  *See, e.g.*, [DE 10-1 at p. 6] ("Whether EAP reported to Mr. O'Malley is irrelevant . . . .").

With respect to Roig's alleged requests for a golf cart and ergonomic chair, O'Malley and Seguin state that Roig never made any such requests to them, that they never denied any such requests, and that they did not have control over any employees' requests for accommodations as such requests are handled by a separate administrative team that did not report to either of them [DE 1-5 ¶¶ 9-10; DE 1-6 ¶¶ 11-12].[4]  Also, O'Malley disputes that Roig was required to fly via

---

[the other case provided] does not offer its reasoning in either the hearing transcript or the order on the motion to dismiss.").  Here, only two of the state court orders that Plaintiffs provide contain any real analysis, and neither order does anything to support Plaintiffs' arguments [*see* DE 12 at pp. 41-50].

[4] Although Olivera states she heard such requests and that she heard O'Malley had the authority approve such requests [DE 10-1 ¶¶ 14, 15], she does not appear to be stating that she was present when such requests were made.  Her declaration also does not show that she herself heard

jump seat and asserts that he even suggested to Roig that Roig fly commercially because of his back condition [DE 1-5 ¶ 11].[5]  According to O'Malley, Roig declined because Roig preferred to fly on a UPS airplane for various reasons [DE 1-5 ¶ 11].

As to the allegations of the Complaint regarding compensation issues, O'Malley and Seguin state that Roig never complained to them about being required to work hours for which he was not paid [DE 1-5 ¶ 17; DE 1-6 ¶ 13].[6]  Nevertheless, they assert they had no control over Roig's compensation for hours worked as such issues were handled by a different department [DE 1-5 ¶ 17; DE 1-6 ¶ 13].  With respect to whether Roig would receive a bonus and/or pay raise, O'Malley states that he could only provide recommendations and that others at UPS had final decision-making authority over whether Roig and other employees he supervised would receive a bonus and/or pay raise [DE 1-5 ¶¶ 12, 16].[7]  Similarly, Seguin states that the final decision as to whether Roig would receive a bonus and/or raise was not up to her [DE 1-6 ¶ 14].

---

O'Malley state he had the authority.  Thus, her statements do not contradict O'Malley's statements based upon personal knowledge.

[5] Olivera's declaration does not appear to dispute O'Malley's statement based upon Olivera's own personal knowledge [*see* DE 10-1 ¶ 16].  Nevertheless, even if it does, it is immaterial to the outcome of the claims against O'Malley and Seguin.  That is because the causes of action asserted against them are not reasonably possible for the reasons discussed in Part III below.

[6] Olivera's declaration attempts to dispute this [*see* DE 10-1 ¶¶ 9, 10, 24].  However, paragraph 9 of her declaration fails to show or explain how she has any personal knowledge.  Paragraph 10 also has no explanation of personal knowledge.  While it states, "from what I saw and heard," Olivera never actually explains what she saw and heard.  Instead, she simply infers Defendants' motivations from what she supposedly "saw and heard."  Paragraph 24, though, includes one statement based on personal knowledge – that Olivera heard a complaint made (presumably to O'Malley).  Olivera otherwise provides arguments, not facts based upon personal knowledge.

[7] Olivera disputes O'Malley's assertion that he did not have authority to unilaterally approve a bonus and raise for Roig based on statements that Olivera declares she heard O'Malley make [DE 10-1 ¶¶ 12, 17].

Finally, the HR managers' declarations state that Roig was paid gross wages of $210,894.42 in 2015 and $83,451 in 2016 (covering January 1, 2016 through April 26, 2016, the date of Roig's death) [DE 1-3 ¶¶ 5-6; DE 20-1 ¶ 4]. They also discuss his receipt of various benefits including short term disability benefits that he received in 2015 at no cost to him [DE 1-3 ¶¶ 7-9; DE 20-1 ¶¶ 5-10]. As a management employee, Roig was entitled to receive 100% of his base salary as an income protection plan benefit [DE 20-1 ¶ 8]. Consequently, he received his full salary during the period of time in which he was in the treatment program (when he claims to have not been compensated) due to his entitlement to short-term disability benefits [*see* DE 1-3 ¶ 7; DE 20-1 ¶ 10].[8] Just as W-2 taxes were withheld when Roig received his regular paycheck, they were also withheld when he continued to receive his salary on account of his short-term disability benefits [DE 20-1 ¶ 9].

## II.   **LEGAL STANDARD**

An out-of-state defendant may remove a case from state court to federal court if the federal court would have diversity jurisdiction over the case. 28 U.S.C. § 1441. Diversity jurisdiction exists "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). Consequently, a case that is removed to federal court on the basis of diversity jurisdiction generally "must be remanded to state court if there is not complete diversity between the parties." *Hunt v. Nationstar Mortg., LLC*, 782 F. App'x 762, 768 (11th Cir. 2019) (citing *Henderson v. Washington Nat'l Ins. Co.*, 454 F.3d 1278, 1281 (11th Cir. 2006)). However, there is a judicially created doctrine, known

---

[8] Olivera asserts that Roig did not receive wages during the period of time in which he underwent treatment because insurance/disability benefits are not wages [DE 10-1 ¶¶ 8, 21]. This does not contradict the facts set forth in the HR managers' affidavits.

as fraudulent joinder, "that provides an exception to the requirement of complete diversity." *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).[9]

### A. FRAUDULENT JOINDER

Fraudulent joinder occurs "[w]hen a plaintiff names a non-diverse defendant solely in order to defeat federal diversity jurisdiction.  [In such a situation], the district court must ignore the presence of the non-diverse defendant and deny any motion to remand the matter back to state court." *Stillwell*, 663 F.3d at 1332 (quoting *Henderson*, 454 F.3d at 1281).  The party that removed the action from state court bears the heavy burden of establishing fraudulent joinder.  *Id.*  To satisfy its burden, it must prove, by clear and convincing evidence,[10] "that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court." *Stillwell*, 663 F.3d at 1332 (quoting *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997)).

"The determination of whether a resident defendant has been fraudulently joined must be based upon the plaintiff's pleadings at the time of removal, supplemented by any affidavits and deposition transcripts submitted by the parties." *Berber*, 760 F. App'x at 688 (quoting *Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1380 (11th Cir. 1998)).  When considering whether a possibility exists that the plaintiff can establish a cause of action against the non-diverse defendant,

---

[9] Plaintiffs argue that removal was premature and that the removal statute no longer allows for a fraudulent joinder analysis.  This argument is meritless.  Again, the fraudulent joinder doctrine is a judicially created exception.  Moreover, it is one that the Eleventh Circuit has continued to recognize over the last decade, including at least twice in 2019. *See, e.g.*, *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329 (11th Cir. 2011); *Berber v. Wells Fargo Bank, N.A.*, 760 F. App'x 684 (11th Cir. 2019); *Hunt*, 782 F. App'x 762.

[10] "Clear and convincing evidence is a 'demanding but not insatiable' standard, requiring proof that a claim is highly probable. 'Highly probable' is a standard that requires 'more than a preponderance of the evidence but less than proof beyond a reasonable doubt.'" *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258-59 (11th Cir. 2013) (citations omitted).

courts "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." *Stillwell*, 663 F.3d at 1333 (quoting *Crowe*, 113 F.3d at 1538).

However, "courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Id.* (quoting *Crowe*, 113 F.3d at 1538). Ultimately, a "plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate." *Id.* (quoting *Triggs*, 154 F.3d at 1287). Nevertheless, "[t]he potential for legal liability 'must be reasonable, not merely theoretical.'" *Legg v. Wyeth*, 428 F.3d 1317, 1325 n.5 (11th Cir. 2005) (citation omitted). *See also Shannon v. Albertelli Firm, P.C.*, 610 F. App'x 866, 870 (11th Cir. 2015) ("If there is a *reasonable possibility* that the complaint states a cause of action against the non-diverse defendant under state law, the district court must remand the case to state court. (emphasis added) (citations omitted)); *Caprio v. R. J. Reynolds Tobacco Co.*, No. 07-20712-CIV, 2007 WL 9702732, at *1 (S.D. Fla. Sept. 28, 2007) (Jordan, J.) ("Joinder is fraudulent where there is *no reasonable possibility* that the plaintiff can prove a cause of action against the non-diverse defendant." (citations omitted)).

Whether a plaintiff can possibly establish a cause of action is determined based upon the applicable state court pleading standard, not the plausibility standard governing Rule 12(b)(6) motions. *Stillwell*, 663 F.3d at 1333-34. As indicated above, however, notwithstanding the application of the state law pleading standard, affidavits and deposition transcripts, if submitted, must still be considered. *See Legg*, 428 F.3d at 1322 (finding that the district court erred by refusing to consider affidavits submitted in support of the defendants' claim of fraudulent joinder); *Shannon*, 610 F. App'x at 871 ("Indeed, a court can abuse its discretion by failing to consider

11

affidavits when resolving a question of fraudulent joinder.").  In this respect, the fraudulent joinder inquiry is more akin to the summary judgment inquiry, albeit without a full-fledged evaluation of the merits.  *See Legg*, 428 F.3d at 1322-23.

### B.  FLORIDA PLEADING STANDARD

"Florida is a fact-pleading jurisdiction, not a notice-pleading jurisdiction."  *Graulau Maldonado v. Orange Cnty. Pub. Library Sys.*, 273 So. 3d 278, 279 (Fla. 5th DCA 2019) (citation omitted).  "A pleading which sets forth a claim for relief . . . must state a cause of action and shall contain . . . a short and plain statement of the ultimate facts showing that the pleader is entitled to relief . . . ."  Fla. R. Civ. P. 1.110(b).  *See also Louie's Oyster, Inc. v. Villaggio Di Las Olas, Inc.*, 915 So. 2d 220, 222 (Fla. 4th DCA 2005) ("In order to state a cause of action, a complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief." (citation omitted)).[11] "Florida's pleading rule [1.110(b)(2)] forces counsel to recognize the elements of their cause of action and determine whether they have or can develop the facts necessary to support it, which avoids a great deal of wasted expense to the litigants and unnecessary judicial effort."  *K.R. Exch. Servs., Inc. v. Fuerst, Humphrey, Ittleman, PL*, 48 So. 3d 889, 893 (Fla. 3d DCA 2010) (quoting *Horowitz v. Laske*, 855 So. 2d 169, 172 (Fla. 5th DCA 2003)).

When reviewing motions to dismiss, Florida courts "take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the pleader."  *Jordan v. Nienhuis*,

---

[11] *See also Seminole Tribe of Fla. v. Times Pub. Co.*, 780 So. 2d 310, 314-15 (Fla. 4th DCA 2001) ("A plaintiff drafting a complaint must state a cause of action alleging legal liability. The complaint must allege a cause of action recognized under law against the defendants; otherwise it does not, in contemplation of the rule, inform the defendant of the nature of the cause against him. In reviewing a dismissal for failure to state a cause of action, the obligation of the appellate court is not to evaluate the stated facts in light of causes of action that *might* have been pled, but to view the facts in relation to the causes of action set forth in the complaint." (internal quotation marks and citations omitted)).

203 So. 3d 974, 976 (Fla. 5th DCA 2016) (citation omitted).[12]  "However, general, vague and conclusory statements" do not satisfy Florida's pleading requirements.  *Id.  See also Turnberry Vill. N. Tower Condo. Ass'n, Inc. v. Turnberry Vill. S. Tower Condo. Ass'n, Inc.*, 224 So. 3d 266, 267 (Fla. 3d DCA 2017) ("Appellant's amended complaint contained a mechanical recitation of the elements of the cause of action, and, in particular, only conclusory allegations that . . . . This is insufficient to withstand a motion to dismiss.").

## III.   **ANALYSIS**[13]

As a preliminary matter, it is evident from the face of the Complaint that it is largely devoid of ultimate facts regarding Seguin's alleged conduct.  Nevertheless, to demonstrate fraudulent joinder, it is incumbent on Defendants to show that there is no reasonable possibility Plaintiffs can maintain any cause of action against both O'Malley and Seguin.  For the reasons discussed herein, I find that Defendants have done so.  Therefore, O'Malley and Seguin should be disregarded for purposes of determining whether diversity jurisdiction exists.  Because the only other defendant, UPS, is diverse from Plaintiffs, and because the amount in controversy requirement is satisfied, *see infra* Part III.F, this Court has diversity jurisdiction (after disregarding the citizenship of O'Malley and Seguin).

---

[12] Florida courts reviewing dismissal motions must confine their review to the four corners of the complaint. *Migliazzo v. Wells Fargo Bank, N.A.*, 290 So. 3d 577, 578-79 (Fla. 2d DCA 2020). However, because the issues before this Court concern fraudulent joinder, and because declarations have been submitted, this Court's review is not confined to the four corners of the Complaint. *See Legg*, 428 F.3d at 1322-23.  Thus, if Defendants' declarations contradict any allegations of the Complaint, then this Court cannot accept such allegations as true. However, any factual controversies between the declarations submitted by the parties must be resolved in Plaintiffs' favor. *See id.*

[13] Nothing herein is intended to minimize Plaintiffs' loss or to be critical of Plaintiffs.  The loss of a loved one is devastating, particularly where, as here, that person is so involved in the lives of his family members.  Anything herein that may appear to be critical is not directed at Plaintiffs individually but rather at the legal contentions made on their behalf.

A. **COMMON DEFENSE RULE**

Prior to addressing the individual counts in which the non-diverse defendants have been named, Plaintiffs argue that the common defense rule requires remand. I disagree. Under the common defense rule, "[w]hen the only proffered justification for [fraudulent] joinder is that there is no reasonable basis for predicting recovery against the in-state defendant, and that showing is equally dispositive of all defendants rather than to the in-state defendants alone, the requisite [fraudulent joinder] showing has not been made." *Smallwood v. Ill. Cent. R. Co.*, 385 F.3d 568, 575 (5th Cir. 2004). Though the Eleventh Circuit has not squarely decided the viability of the common defense rule in this circuit, it has not applied it and has been reluctant to adopt it. *See Shannon*, 610 F. App'x at 872 n.4 (citing *Henderson*, 454 F.3d at 1282 n.4); *Byrnes v. Small*, 60 F. Supp. 3d 1284, 1288 (M.D. Fla. 2014).[14]

Regardless, even if this Court were to find that the common defense rule may be applied in the fraudulent joinder context, "it would not apply here, where the causes of action and corresponding defenses are different as to the diverse and non-diverse defendants." *Byrnes*, 60 F. Supp. 3d at 1288. Although there is some overlap between some of the defenses raised concerning the counts in which all Defendants have been named, a finding that Plaintiffs cannot possibly maintain any cause of action against the non-diverse defendants will not resolve this case in its entirety. Therefore, even if the Eleventh Circuit were to recognize the common defense rule, it does not alter the fraudulent joinder analysis in this case. *See Rainwater v. Lamar Life Ins. Co.*, 391 F.3d 636, 638 (5th Cir. 2004) ("This case turns, therefore, on whether the limitations defense that disposes of all claims against in-state defendants in fact disposes of all claims against all

---

[14] I recognize, as Plaintiffs note, that district courts in Alabama (in this circuit) have applied the common defense rule.

defendants, as the [common defense rule] is triggered only when all defendants are reached.");

*Shannon*, 610 F. App'x at 872 n.4 ("Nor is it clear that the [common defense] rule would apply in this case because a ruling against Shannon on this issue did not 'effectively decide[ ] the entire case.'" (citation omitted)).

### B. COUNTS IV AND VII (Grossly Negligent/Reckless Infliction of Emotional Distress)

In Counts IV and VII, Plaintiffs purport to bring claims for negligent infliction of emotional distress, which they argue are founded upon willful, wanton, and outrageous conduct that exceeds simple negligence. Defendants argue that Counts IV and VII are barred by the impact rule (discussed below). Plaintiffs, however, argue that the impact rule does not apply because they have alleged willful, wanton, and outrageous conduct. They also contend that even if the impact rule does apply, it is satisfied. As discussed herein, Plaintiffs have clearly failed to state a cause of action in both counts because, even drawing all reasonable inferences in their favor, they cannot satisfy the impact rule or an exception thereto.

#### 1. Cause of Action Alleged in Counts IV and VII

At the outset, the allegations of the Complaint leave some uncertainty as to what type of cause of action Plaintiffs are attempting to allege in Counts IV and VII. The Complaint titles each count as "Grossly Negligent/Reckless Infliction of Emotional Distress," and the allegations include (often in the same paragraph or sentence) both language typically associated with negligence (e.g. "duty" and "unreasonable risk") and language typically associated with intentional torts (e.g. "willful and wanton" and "outrageous"). *Compare, e.g.*, Complaint ¶ 141 ("Defendants had a duty to refrain from causing an unreasonable risk of harm") and ¶ 142 (Defendants "breached their duty to avoid creation of an unreasonable risk of harm") *with* ¶ 141 (describing Defendants' conduct as "outrageous acts, which were done willfully and wantonly"); ¶ 143 ("a reasonably prudent

person would characterize [Defendants' actions] as outrageous, willful, and wanton. . . . Defendants'

actions were willful and wanton"); ¶ 144 ("a reasonably prudent person would characterize

[Defendants' actions] as outrageous, willful, and wanton"); ¶ 145 ("wantonly and willfully subjecting

Roig to emotional distress"); ¶ 158 ("outrageous acts, acts which were willful and wanton (grossly

negligent or reckless)"); ¶ 159 ("recklessly causing the death"); ¶ 162 ("Defendants' actions constitute

the negligent infliction of emotional distress under such circumstances that a reasonably prudent

person would characterize them as outrageous."); ¶ 163 ("Defendants' actions were willful and

wanton"); ¶ 164 ("Defendants' actions constitute the negligent infliction of emotional distress under

such circumstances that a reasonably prudent person would characterize them as outrageous, willful,

and wanton."); ¶ 165 ("wantonly and willfully").  Looking at the substance of the counts,[15] there are

two possibilities.  Plaintiffs are either attempting to state a cause of action for intentional infliction

of emotional distress[16] or a cause of action for negligent infliction of emotional distress that

Plaintiffs contend is grounded in willful, wanton, and outrageous conduct.

---

[15] It is axiomatic that the substance of a claim controls over the title that the pleader assigns to the claim.  *See Wells Fargo Bank, N.A. v. Smith as Tr. of Roy F. Smith, Jr. Tr.*, 263 So. 3d 134, 136 (Fla. 1st DCA 2018) ("It is well-settled Florida law that a pleading will be construed according to its substance rather than its form." (citing *Estate of Willis v. Gaffney*, 677 So. 2d 949, 951 (Fla. 2d DCA 1996))); *Patel v. Shah*, 217 So. 3d 152, 155 (Fla. 3d DCA 2017) ("[A]s a general rule, this Court will focus on the substance of the pleading and not its title." (citations omitted)); *State Farm Fla. Ins. Co. v. Hill*, 1 So. 3d 1272, 1274 (Fla. 2d DCA 2009) ("A pleading will be considered what it is in substance, even though mislabelled." (quoting *Sodikoff v. Allen Parker Co.*, 202 So. 2d 4, 6 (Fla. 3d DCA 1967))).  *See also Davis v. Bailynson*, 268 So. 3d 762, 769 (Fla. 4th DCA 2019) ("If it were the case that a party could assert multiple factual scenarios of liability pled as part of 'one count,' and such pleading practice could shield the party from section 57.105(1) fees because at least one scenario was supported in law and fact, then it would elevate form over substance with creative pleading.").

[16] The elements of a cause of action for intentional infliction of emotional distress are the following: "1) the wrongdoer's conduct was *intentional or reckless*; 2) the conduct was *outrageous*; 3) the conduct caused emotional distress; and 4) the emotional distress was severe." *De La Campa v. Grifols Am., Inc.*, 819 So. 2d 940, 943 (Fla. 3d DCA 2002) (emphasis added) (citation omitted).  It is also worth noting that a claim for intentional infliction of emotional distress

Because of the lack of clarity in Plaintiffs' Complaint, Motion, and Reply, I ordered supplemental briefing to give Plaintiffs an opportunity to clarify their claim [*see* DE 30].   I specifically directed the parties to address the following:

> (a) whether a cause of action exists for grossly negligent infliction of emotional distress (distinct from negligent infliction of emotional distress) under Florida law (*and, if such a cause of action exists, what the elements are*), or whether Counts IV and VII can only be treated as claims for intentional infliction of emotional distress or negligent infliction of emotional distress; and (b) assuming that the Court construes Counts IV and VII as counts purporting to state causes of action for intentional infliction of emotional distress, whether these counts state a cause of action, or could, from a fraudulent joinder perspective.

*Id.* (emphasis added).   While Plaintiffs' supplemental brief [DE 33] asserted the existence of a purported intermediate tort of "grossly negligent infliction of emotional distress" separate and distinct from the related causes sounding in pure negligence or intentional tort, Plaintiffs declined the opportunity to specifically identify the elements of the emotional distress claims they are attempting to bring.[17]   Instead, their supplemental brief merely compounded the problematic lack of clarity present in their earlier filings and cited (or, sometimes, referred without citation to) a plethora of irrelevant and/or distinguishable case law.[18]

While Plaintiffs specifically argue for a distinct cause of action for grossly negligent or reckless infliction of emotional distress, from reviewing the case law they have cited and other related case law, in conjunction with the allegations of the Complaint, it is better understood that

---

and the tort of outrageous conduct are one in the same.   *Matsumoto v. Am. Burial & Cremation Servs., Inc.*, 949 So. 2d 1054, 1056 (Fla. 2d DCA 2006) (citing *Baker v. Fla. Nat'l Bank*, 559 So.2d 284, 287 (Fla. 4th DCA 1990)).

[17] As noted above, it is incumbent upon "counsel to recognize the elements of their cause of action and determine whether they have or can develop the facts necessary to support it, which avoids a great deal of wasted expense to the litigants and unnecessary judicial effort."   *K.R. Exch.*, 48 So. 3d at 893 (quoting *Horowitz*, 855 So. 2d at 172).   Clearly, Plaintiffs failed to do this.

[18] Plaintiffs largely focus on what they do not need to show without ever identifying what it is that they need to show.

they are attempting to assert causes of action for negligent infliction of emotional distress, while

trying to avoid the application of the impact rule by relying on an exception to the impact rule for

willful, wanton, and outrageous conduct.[19]  *Cf. Bohannon v. Wells Fargo Home Mortg.*, No. 1:12-

CV-336-TCB, 2012 WL 13014023, at *5 (N.D. Ga. Apr. 13, 2012) ("Bohannon's response brief,

while using the label 'negligent infliction of emotional distress,' argues that no impact is required

because Wells Fargo engaged in malicious, willful or wanton conduct. Thus, the Court construes

Bohannon's emotional-distress claim as a claim for intentional infliction of emotional distress.").

### 2. Impact Rule

"The impact rule, as applied in Florida, requires that 'before a plaintiff can recover damages

for emotional distress caused by the negligence of another, the emotional distress suffered must

flow from physical injuries the plaintiff sustained in an impact.'" *Fla. Dep't of Corr. v. Abril*, 969

So. 2d 201, 206 (Fla. 2007) (quoting *R.J. v. Humana of Fla., Inc.,* 652 So. 2d 360, 362 (Fla. 1995)).

Stated differently,

> The impact rule is the rule of law followed in Florida applicable to cases in which
> the plaintiff claims mental or emotional damages but *has not sustained any physical
> impact or contact*, unless the claim falls within one of the recognized exceptions to
> the rule. When an impact or touching has occurred *the rule has no application*.

*Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007).[20]  "[T]he underlying basis

for the [impact] rule is that allowing recovery for injuries resulting from purely emotional distress

---

[19] Plaintiffs have never claimed to be bringing a cause of action for intentional infliction of emotional distress, even though Counts IV and VII appear to be based on conduct that Plaintiffs argue arises from intentional, reckless, willful, wanton, and outrageous conduct.  Even in their supplemental brief [DE 33], Plaintiffs did not attempt to make an intentional infliction of emotional distress argument, notwithstanding the fact that I ordered them to address the following: "assuming that the Court construes Counts IV and VII as counts purporting to state causes of action for intentional infliction of emotional distress, whether these counts state a cause of action, or could, from a fraudulent joinder perspective" [DE 30].

[20] Plaintiffs suggest that "the impact rule arguably no longer exists," citing *Chirillo v. Granicz*, 199 So. 3d 246 (Fla. 2016).  This argument is frivolous.  *Chirillo*, a medical malpractice case that

would open the floodgates for fictitious or speculative claims." *Elliott v. Elliott*, 58 So. 3d 878, 881 (Fla. 1st DCA 2011) (quoting *Gracey v. Eaker*, 837 So. 2d 348, 355 (Fla. 2002)). "Thus, the impact rule has been applied as a limitation to assure the validity of claims for emotional and psychological harm." *Id.* (citing *Rowell v. Holt*, 850 So. 2d 474, 478 (Fla. 2003)).

However, the impact rule is not an unyielding rule that

must be blindly followed without regard to context . . . [e]xceptions to the rule have been narrowly created and defined in a certain very narrow class of cases in which the foreseeability and gravity of the emotional injury involved, and lack of countervailing policy concerns, have surmounted the policy rationale undergirding application of the impact rule.

*Rowell*, 850 So. 2d at 478 (citations omitted). *See also D.E.W. v. Krouse*, 41 So. 3d 320, 321 (Fla. 4th DCA 2010) (recognizing that there are only "limited exceptions in extraordinary circumstances" (citation omitted)). For instance, "the impact rule is inapplicable to recognized intentional torts that result in predominantly emotional damages such as intentional infliction of emotional distress, defamation, or invasion of privacy claims." *S. Baptist Hosp. of Fla., Inc. v. Welker*, 908 So. 2d 317, 320 (Fla. 2005) (citing *Rowell*, 850 So. 2d at 478 n.1).[21]

---

concerned the duty owed by a physician or psychotherapist towards his/her patient, makes no mention of the impact rule whatsoever.

[21] "Traditionally, [the Florida Supreme Court] ha[s] analyzed the applicability of the impact rule in cases involving recognized causes of action." *Id.* (citations omitted). It has consequently noted that "the issue of whether the impact rule applies is inextricably intertwined with the type of cause of action that is asserted." *Id.* In this case, the Estate's emotional distress claims are associated with its FCRA claims. In fact, Plaintiffs argue that this case is "inextricably intertwined with *intentional* discrimination and retaliation," [DE 10 at p. 1] (emphasis added), and that "the NIED is inextricably intertwined with the FCRA violations." [DE 10 at p. 14]. However, O'Malley and Seguin, who cannot be considered employers under the FCRA, have (correctly) not been named as defendants in the FCRA counts because they cannot be liable thereunder. *See Patterson v. Consumer Debt Mgmt. & Educ., Inc.*, 975 So. 2d 1290, 1292 (Fla. 4th DCA 2008) ("[T]he FCRA does not impose liability on individual employees/supervisors or individuals who are the sole owners of corporations for acts of discrimination").

### 3.   Willful/Wanton Exception Not Applicable

Based on allegations in the Complaint and the assertions in their supplemental brief, Plaintiffs seek to avoid the impact rule's strictures by asserting that Defendants' conduct was "willful and wanton," "reckless," "outrageous," and/or "grossly negligent."  Florida courts have recognized a limited exception to the impact rule where willful and wanton conduct, or other similar conduct, has occurred.  *See, e.g.*, *Williams v. Boyd-Panciera Family Funeral Care, Inc.*, 293 So. 3d 499, 501 (Fla. 4th DCA 2020) ("The impact rule does not bar claims grounded on the tortfeasor's malice, great indifference, willful or wanton conduct, or outrageous conduct." (citations omitted)).  However, it is highly doubtful that this limited exception is broad enough to even possibly apply in a case like this one, alleging negligence-based conduct in the employment context.  *See Fogle v. IBM Corp.*, No. 8:19-CV-2896-T-33JSS, 2020 WL 4260988, at *3 (M.D. Fla. July 24, 2020) ("Fogle and IBM's relationship is merely a business relationship. Fogle has failed to point this Court to any case law supporting his argument that conduct in such circumstances, even if willful and wanton, warrants an exception to the impact rule.").

To support their willful/wanton argument, Plaintiffs rely on cases like *Gonzalez v. Metro. Dade Cnty. Pub. Health Tr.*, 651 So. 2d 673, 674 (Fla. 1995) and *Brady v. SCI Funeral Servs. of Fla., Inc.*, 948 So. 2d 976, 978 (Fla. 1st DCA 2007).  However, in *Gonzalez*, the Florida Supreme Court merely reaffirmed that "[t]he absence of physical impact does not bar a claim *for the negligent mishandling of a dead body* under Florida law."  651 So. 2d at 675 (emphasis added).  Specifically, it held that "[a]n action for mental anguish based on negligent handling of a dead body requires proof of either physical injury or willful or wanton misconduct."  *Id.* at 676.  *Brady* similarly addressed the "negligent mishandling of a dead body" and recognized that in *Gonzalez*, the Florida Supreme Court "explained that the impact rule applies to *such* negligence claims unless

the alleged misconduct is willful and wanton." *Brady*, 948 So. 2d at 978 (emphasis added). Contrary to *Brady* and *Gonzalez*, this case does not involve any allegations that O'Malley and Seguin mishandled Roig's dead body; it involves acts they allegedly did or did not do, while Roig was still alive, in the course of an ordinary (even if perhaps acrimonious) employment relationship.

Plaintiffs also rely on a veterinarian negligence case where the impact rule was not applied. *See Knowles Animal Hosp., Inc. v. Wills*, 360 So. 2d 37, 38 (Fla. 3d DCA 1978). It is questionable whether *Knowles* is still good law. *See Kennedy v. Byas*, 867 So. 2d 1195, 1197 (Fla. 1st DCA 2004). However, even assuming it is, it does not affect the outcome of this case because *Knowles* is clearly distinguishable, as it concerned veterinarian malpractice, not acts occurring in the context of an employer-employee relationship. Like the plaintiff in *Fogle*, Plaintiffs fail to point the Court towards any Florida case that has extended the narrow willful/wanton exception to the impact rule to a case in the employment context or, indeed, any case that did not involve the mishandling of human remains or animals. In short, finding that the impact rule does not apply in this case would undoubtedly go significantly further than any case has gone before. Moreover, as a practical matter, it would effectively vitiate the impact rule by "open[ing] the floodgates for fictitious or speculative claims." *Elliott*, 58 So. 3d at 881.

However, even assuming the willful/wanton exception to the impact rule could theoretically apply in an employment-context case, it does not aid the Plaintiffs here. Notwithstanding the use of the buzz words "willful" and "wanton" and "outrageous," the Complaint is devoid of ultimate facts sufficient to establish such conduct even if the willful and wanton exception could apply in these factual circumstances.

In order for Defendants' alleged conduct to qualify as "willful and wanton" (and, thus, for Plaintiffs to avoid satisfying the impact rule), their conduct must rise to the level of "outrageous."

*See Fogle*, 2020 WL 4260988, at *3 ("[W]illful and wanton conduct is typically understood as the sort of 'outrageous' conduct that could support an intentional infliction of emotional distress claim." (citing *Williams v. City of Minneola*, 619 So. 2d 983, 986-87 (Fla. 5th DCA 1993))).[22] Indeed, Plaintiffs apparently acknowledge this standard since, as detailed above, Counts IV and VII repeatedly allege that Defendants' conduct was outrageous and reckless, as well as "willful and wanton."

Here, looking past the buzz words and conclusory allegations, the alleged conduct of O'Malley and Seguin cannot possibly be considered willful and wanton or outrageous under Florida law, even imagining the worst possible and most deplorable version of the actions alleged in the Complaint. "What constitutes outrageous conduct is a question for the trial court to determine as a matter of law." *De La Campa*, 819 So. 2d at 943 (citing *Johnson v. Thigpen,* 788 So.2d 410, 413 (Fla. 1st DCA 2001)). "Outrageous conduct is conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" *Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 870 (Fla. 3d DCA 2004) (quoting *Metropolitan*

---

[22] Even with the older line of cases Plaintiffs cite in support of their willful/wanton argument (in the veterinarian context), the court in one case recognized that the conduct at issue must be outrageous to rise to willful and wanton conduct. *See Levine v. Knowles*, 197 So. 2d 329, 331 (Fla. 3d DCA 1967) ("Similarly, if the destruction were to be caused in such an outrageous manner as to amount to a willful, wanton, reckless, or malicious disregard of the owner's rights, punitive damages might be recoverable."). *See also Fernandez v. Cmty. Asphalt, Inc*., 934 F. Supp. 418, 421 (S.D. Fla. 1996) (rejecting argument that allegation of "gross negligence" allows avoidance of the impact rule and noting that the impact rule is only waived for "conduct that amounts to *intentional infliction of emotional distress*"). Equating "willful and wanton" with "outrageous" in the context of this exception to the impact rule is also logically consistent with the Florida Supreme Court's finding that "the impact rule is inapplicable to recognized intentional torts that result in predominantly emotional damages such as intentional infliction of emotional distress . . . ." *S. Baptist Hosp. of Fla.*, 908 So. 2d at 320 (citing *Rowell*, 850 So. 2d at 478 n.1). The same level of outrageousness that underlies a claim for intentional infliction of emotional distress, and justifies not applying the impact rule to such claims, would similarly justify non-application of the impact rule to a claim of negligence involving a similar level of outrageous conduct.

*Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985)).  *See also Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 955 (Fla. 3d DCA 2017) (recognizing that the conduct "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' . . . [E]ven purposeful conduct that one knows is going to hurt another is not outrageous enough to support a claim." (internal citation omitted)).  Liability "does not extend to mere insults, indignities, threats, or false accusations."  *Williams*, 877 So. 2d at 870 (citation omitted).  In fact, "Florida courts have been reluctant to find claims for intentional infliction of emotional distress based solely on allegations of verbal abuse," and "[f]ederal courts interpreting Florida law have allowed claims for intentional infliction of emotional distress in the workplace to go forward, where the claims involve persistent verbal abuse *coupled with repeated offensive physical contact*."  *De La Campa*, 819 So. 2d at 943-44 (emphasis added) (citations omitted).  As discussed below, no such physical contact occurred here.

The facts in *Williams* are particularly instructive for putting the alleged conduct here in context.  In *Williams*, the appellate court affirmed the trial court's dismissal of the complaint with prejudice.  877 So. 2d at 869-70.  The plaintiff, a former employee of the corporate defendant, had claimed that his supervisor and the company discriminated against him due to his race.  *Id.* at 870. In fact, multiple supervisory employees called the plaintiff "[n-word] and 'monkey' in front of him, other employees, over the 'walkie talkie,' and over the work radio."  *Id.*  The plaintiff's supervisor repeatedly told him that he did not want his "black ass" there.  *Id.*  Moreover, his supervisor directed another supervisor "to 'create a record' of false disciplinary related incidents" for the plaintiff in order to justify his later termination.  *Id.*  The plaintiff's supervisor also "constantly and persistently threatened [him] with job termination for no apparent reason."  *Id.*

The company falsely accused the plaintiff of stealing.  *Id*.  The plaintiff's supervisor also directed him to work in dangerous conditions and move dangerous equipment and forced extra work upon him to "eliminate" the plaintiff's breaks.  *Id*.  While recognizing that the alleged conduct was "reprehensible, objectionable, and offensive" (which puts it mildly), the court found that the alleged conduct, accepted as true, "did not rise to the level that may be reasonably regarded as so extreme and outrageous so as to permit [the plaintiff] to recover in an action for intentional infliction of emotional distress." *Id*.[23]

With all due respect to Plaintiffs (who undoubtedly have suffered significantly from the loss of their father and husband), the conduct alleged in this case is significantly less offensive than the conduct alleged in *Williams* that did not legally qualify as outrageous in the emotional distress context.  The sole alleged insults in this case are that O'Malley told Roig he walked slow and shook from medication, a far cry from the repeated racial epithets alleged in *Williams*.  O'Malley is also alleged to have criticized Roig's work (at least on one occasion) and to have

---

[23] *See also Lay v. Roux Labs., Inc.*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980) ("Here, the alleged conduct of Kremer was that he 'began to threaten her (Donesta Lay) with the loss of her job, then said defendant began using humiliating language, vicious verbal attacks, racial epithets and called plaintiff [the n-word]' when an argument arose concerning a parking space. Although the alleged conduct is extremely reprehensible, we do not think that the alleged conduct reaches the level of outrageousness and atrociousness . . . ."); *Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1574 n.2, 1575 n.7 (11th Cir. 1993).  Plaintiffs appear to argue, in their supplemental brief, that in banning employment discrimination through the FCRA, Florida has determined that employment discrimination is so "pernicious and malicious" and shows such "great indifference" to the rights of employees that such discrimination "clearly constitutes" the kind of conduct contemplated by the line of cases establishing the exception to the impact rule on which they seek to rely.  However, the cases on which Plaintiffs rely – *Byrd v. Richardson-Greenshields Sec., Inc.*, 552 So. 2d 1099 (Fla. 1989) and *Gerber v. Vincent's Men's Hairstyling, Inc.*, 57 So. 3d 935, 937 (Fla. 4th DCA 2011) – are completely inapposite.  These cases address the question of whether workers' compensation is the exclusive remedy for discrimination claims but say absolutely nothing regarding the applicability of the impact rule.  Further, to the extent Plaintiffs believe that discrimination inherently rises to the level of outrage necessary, *Williams* squarely refutes that notion.

questioned why Roig missed time from work.  Additionally, O'Malley is alleged to have denied

(or to have at least played a role in denying) Roig a bonus and raise.  Even if these actions were

unjustifiable – or even if they were pretexts for pushing Roig into retirement or building a case for

his termination – these actions are no worse than (and truly appear less frequent and less offensive

than) the false accusations and "constant[], persistent[] threat[s]" of termination in *Williams*.

Finally, O'Malley is alleged to have denied reasonable accommodations by denying Roig's request

for a golf cart and ergonomic chair.  Again, even if these denials were done with an insensitive

disregard of Roig's physical pain, they are not worse than the alleged decisions in *Williams* to

place that plaintiff in physically-dangerous situations.

In short, if the conduct in *Williams* could not, as a matter of law, be considered

"outrageous," the similar-in-kind but lesser-in-degree conduct alleged here cannot possibly meet

that standard either.  Moreover, if an employee could even possibly recover emotional distress

damages when his or her supervisor criticizes the employee's work, questions the employee's need

for time off, prevents the employee from receiving a bonus or raise, or denies a request for a golf

cart or ergonomic chair,[24] it would open the floodgates for litigation over all manner of

commonplace employment decisions.

### 4.  Count IV

Ultimately, because Plaintiffs cannot show willful/wanton/outrageous conduct (as a matter

of law) based on the allegations of the Complaint (viewed in the light most favorable to Plaintiffs),

---

[24] As noted above, O'Malley and Seguin declare that they did not deny, and that they did not have control over, requests for reasonable accommodations, which are handled by a separate department.  These statements are not disputed.  While Olivera's declaration attempts to refute these statements, it does not set forth facts based on personal knowledge.  *See supra* note 4.

and because they have not argued or shown that any other exceptions to the impact rule could apply, Roig must have suffered an impact for the Estate to even possibly prevail on Count IV.

It is evident that Plaintiffs' allegations in Count IV cannot satisfy the impact rule.  The Motion does not specifically state what the supposed physical impact was.  However, Count IV alleges that "Roig suffered a physical impact because of the words Defendants O'Malley and Seguin spoke to him."   Complaint ¶ 143.   In the Motion, Plaintiffs argue in passing that "audiological impact is enough."  [DE 10 at p. 14] (citing *Eagle-Picher Indus., Inc. v. Cox*, 481 So. 2d 517, 527 (Fla. 3d DCA 1985)).  In doing so, they rely on the court's statement in *Eagle-Picher* that "[t]he essence of impact, then, it seems, is that the outside force or substance, no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body." 481 So. 2d at 527.

*Eagle-Picher* does absolutely nothing to support Plaintiffs' audiological-impact argument, and Plaintiffs' argument that mere words spoken to another satisfy the impact rule is frivolous.  In *Eagle-Picher*, the court addressed whether the inhalation of asbestos satisfied the impact rule.  *Id.* at 526-27.  It did not, however, address whether spoken words can satisfy the impact rule. The impact considered in *Eagle-Picher* – the inhalation or "ingestion of harmful chemicals" (even if invisible) that are known to potentially cause disease – is clearly distinguishable from perceiving sound waves.  Plaintiffs cite no other authority that supports their misguided attempt to expand what can satisfy the impact rule substantially further than has ever been done before.[25]  If spoken

---

[25] Plaintiffs repeatedly argue that their attorneys have prevailed in opposing motions to dismiss in state court in cases where they have brought similar claims.  However, as mentioned above, only two of the state court orders filed by Plaintiffs contain any analysis.  *See supra* note 3.  Of those two decisions, one (*Herrera v. Jarden Corp.*) discusses, and *explicitly rejects*, a similar audiological impact argument made by Plaintiffs' counsel [*see* DE 12 at pp. 49-50] ("Plaintiff's claim that she suffered an 'audiological impact' as a result of being terminated over the telephone does not satisfy the physical impact requirement, and is not comparable to cases that found a

words, or mere perception of sound waves or light waves, could satisfy the impact rule, the rule would be rendered a nullity, and its purpose in limiting emotional distress claims to circumstances where such distress is likely or verifiable would be effectively eliminated.  Because the Estate has failed to satisfy the impact rule, it cannot possibly maintain a cause of action based on the allegations contained in Count IV of the Complaint.[26]

### 5.   No Impact Suffered by Olivera, K.R., or S.R. (Count VII)

Count VII also fails against O'Malley and Seguin due to the impact rule.  For the reasons discussed above, the alleged conduct does not satisfy the willful and wanton exception to the impact rule (meaning the impact rule applies).  In the Complaint, Plaintiffs allege that Olivera and

---

limited audiological exception to the physical impact rule."). In the other decision (*Winter v. Noven Pharmaceuticals*) [DE 12 at pp. 41-47], the court dismissed a claim for intentional infliction of emotional distress, but it denied dismissal of a claim for negligent infliction of emotional distress. It denied dismissal of the latter because the plaintiff allegedly "suffered an impact when he was physically removed" [DE 12 at p. 45]. Thus, *Winter* provides no support for Plaintiffs' audiological impact argument.

[26] Count IV (and Count VII) likely also fails, with respect to O'Malley and Seguin, based upon Defendants' argument that the Complaint fails to allege a cognizable duty on the part of the individual Defendants. Significantly, a "claim for negligent infliction of emotional distress . . . requires an adequately pled underlying claim of negligence." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). Of course, "[e]stablishing the existence of a duty under Florida's negligence law is a minimum threshold legal requirement that opens the courthouse doors, and is ultimately a question of law for the court rather than the jury." *Lett*, 2014 U.S. Dist. LEXIS 191057, at *13-14 (quoting *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012)).

As noted above, Plaintiffs appear to rely on a duty created by the FCRA, arguing that this case is "inextricably intertwined with *intentional* discrimination and retaliation," [DE 10 at p. 1] (emphasis added), and that "the NIED is inextricably intertwined with the FCRA violations" [DE 10 at p. 14]. I reiterate, however, that O'Malley and Seguin cannot be liable under the FCRA. *See Patterson*, 975 So. 2d at 1292. Thus, while it possible that the FCRA can establish a duty on the part of UPS, it cannot do the same on the part of O'Malley and Seguin. Plaintiffs also argue that Defendants had a duty to protect Roig from the "foreseeable zone of risk" their conduct created [DE 10 at p. 13], though the contours of this "zone of risk" argument are also questionable. Nevertheless, it is not necessary to decide the duty issue because Counts IV and VII clearly fail as Plaintiffs cannot possibly satisfy the impact rule or an exception thereto.

S.R. suffered a physical impact from the viewing of Roig's body after his death occurred and that K.R. suffered a physical impact from hearing about Roig's death on the phone after it occurred. Complaint ¶¶ 3, 19, 161. However, in the Motion, the individual Plaintiffs do not claim to have suffered a physical impact themselves in discussing Count VII; if they raise it at all in the Motion, they do so in a conclusory manner.[27]

In any event, it is clear that the individual Plaintiffs did not suffer any physical impact from an external force. *See Janie Doe 1 ex rel. Miranda v. Sinrod*, 117 So. 3d 786, 789 (Fla. 4th DCA 2013) ("Here, the parents do not, and cannot, allege that they suffered an impact from an external force."). Again, Plaintiffs cite no authority holding that perceiving light (seeing the dead body) or sound waves (hearing about Roig's death) alone can constitute an "impact."

In their Reply (but not in their Motion) Plaintiffs allude to cases allowing recovery for negligent infliction of emotional distress suffered by surviving spouses and others who viewed their loved one's dead body.  [DE 23 at p. 5].  Such cases, however, do not involve application of the impact rule, but rather a relaxation of the impact rule for plaintiffs "who suffer a physical injury as a result of emotional distress arising from their witnessing the death or injury of a loved one," *Godelia v. Doe 1*, 881 F.3d 1309, 1322 (11th Cir. 2018), and who can satisfy the following elements:

> (1) the plaintiff must suffer a physical injury; (2) the plaintiff's physical injury must be caused by the psychological trauma; (3) the plaintiff must be involved in some way in the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured person.

---

[27] Although the Motion is largely, if not entirely, silent on the issue, Defendants specifically discuss in their Response why Count VII is barred by the impact rule [*see* DE 20 at pp. 8-9].  Thus, Plaintiffs' contention in their Reply that Defendants do not differentiate between the emotional distress claims brought by the Estate and the individual Plaintiffs [DE 23 at p. 5] is misplaced.

*Zell v. Meek*, 665 So. 2d 1048, 1054 (Fla. 1995).  These elements pertain to what is commonly referred to as the "bystander rule."  *See Pipino v. Delta Air Lines, Inc.*, 196 F. Supp. 3d 1306, 1315-18 (S.D. Fla. 2016); *Bater v. Unique Vacations, Inc.*, No. 17-21703-CIV, 2020 WL 5514399, at *8 (S.D. Fla. Aug. 17, 2020).

However, in order to satisfy these elements, Plaintiffs must show, *inter alia*, that they were "'involved' in the incident by seeing, hearing, or arriving on the scene as the traumatizing event occur[red]."  *Sinrod*, 117 So. 3d at 789 (quoting *Willis*, 967 So. 2d at 850).  These Plaintiffs do not (and cannot) satisfy this element.  That is because the allegations of the Complaint make clear that Plaintiffs did not witness or actually hear Defendants' alleged conduct occur.  Based on the allegations of the Complaint, the conduct occurred prior to the date of Roig's death.  Nor did they witness or actually hear Roig's death occur.  Instead, they were *told* about Roig's death *after* it occurred – they heard about it after the fact, not as it happened, and no Plaintiff arrived on the scene as the alleged traumatizing event occurred.[28]  Therefore, Plaintiffs cannot possibly state a cause of action in Count VII of the Complaint.

---

[28] In arguing that Roig's family members state a cause of action because they saw Roig's body after his death and/or heard about his death, Plaintiffs cite to *Watters v. Walgreen Co.*, 967 So. 2d 930 (Fla. 1st DCA 2007).  [*See* DE 23 at pp. 5-6; DE 33 at p. 4].  For instance, in their Reply, Plaintiffs (citing to *Watters*) argue that:

> The DCAs have held that seeing the dead body of the loved one suffices for a NIED claim brought by a surviving spouse and stepchildren and remanded for the lower court to determine whether a stepchild who was called on the phone at summer camp and told about the death shortly after it happened could assert a NIED claim.

[DE 23 at pp. 5-6].  However, Plaintiffs omit that the appellate court in *Watters* made clear, on appeal, that it was solely addressing the element that "the plaintiff must have a close personal relationship to the directly injured person," and that it was not addressing the other three elements, including the element that "the plaintiff must be involved in some way in the event causing the negligent injury to another."  967 So. 2d at 932-34 & n.1.  For the same reason, *Watters* does not support Plaintiffs' suggestion that hearing about a loved one's death provides a sufficient impact to satisfy the impact rule.

### C.  COUNT V (Wrongful Death/Survival Act Claim)

Count V fails to state a cause of action against O'Malley and Seguin.  In Count V, given that the wrongful death and survival act claims are alleged to arise out of the same conduct, they have been brought in the alternative.  Under the Florida Wrongful Death Act, a cause of action exists "[w]hen the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person . . . and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued . . . ."  § 768.19, Fla. Stat.  Thus, "the Wrongful Death Act does not encompass damages caused by any other injury *not* resulting in death."  *Harris v. R.J. Reynolds Tobacco Co.*, 383 F. Supp. 3d 1315, 1325 (M.D. Fla. 2019).

On the other hand, Florida's survival statute provides that "[n]o cause of action dies with the person.  All causes of action survive and may be commenced, prosecuted, and defended in the name of the person prescribed by law."  § 46.021, Fla. Stat.  "A survival action allows a survivor to stand in the decedent's shoes and recover compensation for the damages that accrued while the decedent was still alive, such as the decedent's pain and suffering, medical expenses, and lost earnings."  *Harris*, 383 F. Supp. 3d at 1324 (citing *Martin v. United Sec. Servs., Inc.*, 314 So. 2d 765, 767 (Fla. 1975)).  "A survival action is appropriate where 'a personal injury caused by another's tortious conduct does not result in death, and the injured person later dies due to other causes.'"  *Id.* (quoting 4 Fla. Forms of Jury Instr. § 145.02).

However, when a personal injury causes one's death, Florida law "essentially substitutes a statutory wrongful death action for the personal injury action that would otherwise survive under section 46.021."  *Id.* at 1325 (citing *Niemi v. Brown & Williamson Tobacco Corp.*, 862 So. 2d 31, 33 (Fla. 2d DCA 2003)).  "[T]he intent of the amended Wrongful Death Act is that 'a separate

lawsuit *for death-resulting personal injuries* cannot be brought as a survival action under Section 46.021.'" *Id.* (quoting *Williams v. Bay Hosp., Inc.*, 471 So. 2d 626, 629 (Fla. 1st DCA 1985)).

In this case, whether a survival action can exist against O'Malley and Seguin depends on Plaintiffs' ability to maintain a cause of action in any of the *other* counts against O'Malley and Seguin for non-death-resulting injuries. For the reasons discussed throughout this Report, the survival action must fail because Plaintiffs have failed to show that they can possibly state any cause of action against O'Malley or Seguin. In other words, for the reasons discussed in this Report, Roig would have been unable to maintain any of the causes of action that the Estate has brought against O'Malley and Seguin.[29]

The wrongful death claim fails for the same reason. As the Florida Supreme Court has recognized:

> While the Wrongful Death Act creates independent claims for the survivors, these claims are also derivative in the sense that they are dependent upon a wrong committed upon another person. No Florida decision has allowed a survivor to recover under the wrongful death statute where the decedent could not have recovered.
>
> The right of the survivors to recover is predicated in the Act on the decedent's right to recover. In other words, recovery is precluded if the decedent could not have maintained an action and recovered damages if death had not ensued. Section 768.19, Florida Statutes (2008), provides for a cause of action when the death of a person is caused by the wrongful act, negligence, default, or breach of contract or

---

[29] Plaintiffs argue that their motion for remand must be granted because Defendants did not address their survival action. However, it is evident that Defendants demonstrated that the survival action fails by addressing all of Plaintiffs' other causes of action against O'Malley and Seguin. Plaintiffs also argue that their survival action allegations are sufficient because a similarly pled survival action (albeit one with different facts) survived summary judgment in another case their attorneys worked on. *See* DE 23 at pp. 2-3 (citing *Estate of Cimino v. Am. Airlines, Inc.*, No. 15-001723 (26), 2020 WL 1068903, at *1 (Fla. Cir. Ct. Feb. 12, 2020)). However, the non-binding decision in *Cimino* is not helpful for purposes of evaluating the survival action here because *Cimino* merely notes that summary judgment on that claim was precluded based on the court's finding that there was a genuine issue of material fact (without addressing which material fact(s) related to the survival act claim were in dispute). 2020 WL 1068903, at *1.

warranty of any person, . . . *and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued.*

*Laizure v. Avante at Leesburg, Inc.*, 109 So. 3d 752, 760 (Fla. 2013) (internal citations, quotation marks, and alterations omitted).

With respect to the wrongful death claim, Defendants further argue, *inter alia*, that Plaintiffs cannot state a cause of action because they cannot possibly establish that Roig's death was proximately caused by the complained-of conduct.  The Estate argues that the alleged discrimination and retaliation by Defendants caused Roig's death and that proximate cause is a jury issue.  However, even if the Estate can prove its FCRA claims, those claims are against UPS, not O'Malley and Seguin.  Thus, even if discrimination violative of the FCRA could constitute wrongful conduct under the Wrongful Death Act (which seems highly suspect), it does not constitute wrongful conduct on the part of O'Malley and Seguin in a legal sense.  *See supra* note 21.  Also, the only retaliation claim against O'Malley and Seguin is the wage retaliation claim, which fails for the reasons discussed below.

Regardless, it is simply not possible (legally or factually) for the alleged discriminatory and retaliatory acts to have been the proximate cause of Roig's death.  Such allegations are both fanciful and frivolous.  "[P]roximate cause asks 'whether and to what extent the defendant's conduct *foreseeably and substantially* caused the specific injury that actually occurred.'"  *Chirillo*, 199 So. 3d at 249 (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)) (emphasis added).  For purposes of the wrongful death claim, the specific injury that actually occurred is death.  "[H]arm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question."  *McCain*, 593 So. 2d at 503.  However, "an injury caused by a freakish and improbable chain of events would not be 'proximate' precisely because it is unquestionably

unforeseeable." *Id.* "The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience." *Id.* While proximate cause is often a jury issue, it is not always. *See id.* at 504 ("The judge is free to take this matter from the fact-finder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference." (citation omitted)).

Here, no reasonable person could possibly conclude that any of the alleged misconduct foreseeably and substantially caused Roig's death. Plaintiffs allege that Defendants caused Roig's death mainly by denying his request for a golf cart and ergonomic chair (almost 2 years before Roig's death) and by not awarding him a bonus and pay raise (O'Malley is alleged to have informed Roig that he may recommend against a bonus and raise during the month before Roig's death). Complaint ¶¶ 65, 101, 147-48. Roig is alleged to have learned from his wife on the morning that he died that his paycheck did not reflect a pay increase. *Id.* ¶ 106. Nevertheless, as alleged in the Complaint, Roig died in his office from sudden cardiac arrest. *Id.* ¶ 108. "Prudent human foresight" cannot possibly lead a reasonable person to conclude that the denial of a raise or a bonus *typically* causes a fatal heart attack. It similarly could not lead a reasonable person to conclude that denial of the accommodations Roig requested would likely lead to a heart attack two years later.

Looking at the undisputed facts, and drawing all reasonable inferences in favor of the Estate, common sense dictates that the issue would be disposed of long before reaching a jury in this case in any court. A contrary conclusion would open the floodgates of litigation because adopting such a conclusion would be effectively endorsing a whole universe of personal injury claims that could be brought when an employer and/or supervisor decide against giving an employee a bonus or raise or deny a request for an ergonomic chair or a golf cart. Simply stated,

any court would immediately recognize that the Estate's wrongful death claim, and Plaintiffs' other claims against O'Malley and Seguin, must fail.

### D.  COUNT VIII (Florida Constitution Art. 10, § 24(c) Wages)

I find that the Estate cannot possibly maintain the wages cause of action alleged in Count VIII because – among other issues, including those discussed in Part III.E below – it failed to provide the requisite pre-suit notice to Defendants.  Stated differently, the Estate's failure to provide notice prior to filing suit renders it impossible for the Estate to maintain a lawsuit for the cause of action alleged in Count VIII of the Complaint.  It is undisputed that pre-suit notice was not provided and that such notice is required under the Florida Minimum Wage Act ("FMWA").[30] Instead, the Estate argues that it was not obligated to provide the notice required under the FMWA because it brought Count VIII under Art. X, § 24 of the Florida Constitution, not under the FMWA.

The Estate's argument misses the mark.  Although Art. X, § 24(f) provides that "[i]mplementing legislation is not required in order to enforce this amendment," it also expressly states that "[t]he state legislature may by statute . . . adopt any measures appropriate for the implementation of this amendment."  Significantly, the FMWA expressly states that its purpose "is to provide measures appropriate for the implementation of s. 24, Art. X of the State Constitution, in accordance with authority granted to the Legislature pursuant to s. 24(f), Art. X of the State Constitution."  § 448.110(2).  *See also Anagnos v. Nelsen Residence, Inc.*, 721 F. App'x 901, 904 (11th Cir. 2018) ("The Wage Amendment also contemplates the use of implementing

---

[30] *See* § 448.110(6)(a), Fla. Stat. ("[P]rior to bringing any claim for unpaid minimum wages pursuant to this section, the person aggrieved shall notify the employer alleged to have violated this section, in writing, of an intent to initiate such an action. The notice must identify the minimum wage to which the person aggrieved claims entitlement, the actual or estimated work dates and hours for which payment is sought, and the total amount of alleged unpaid wages through the date of the notice.").

legislation. It provides that '[t]he state legislature may by statute . . . adopt any measures appropriate for the implementation of this amendment.' Fla. Const. art. X, § 24(f). Based on that authority, the Legislature passed the Wage Act 'to provide measures appropriate for the implementation of [section] 24, Art. X of the State Constitution.' Fla. Stat. § 448.110(2)."). Moreover, the FMWA "constitute[s] the exclusive remedy under state law for violations of s. 24, Art. X of the State Constitution."  § 448.110(10).  If litigants could bring suit solely under the Constitutional provision, and simply side-step or ignore the strictures of the implementing legislation, it would render both the statute and § 24(f)'s express authorization of implementing legislation nullities.

It is for these reasons that the judges in this district who have squarely decided the issue have expressly held that the notice requirement under the FMWA applies to Art. X, § 24 of the Florida Constitution.  *See, e.g.*, *Montes v. M & M Mgmt. Co.*, No. 15-80142-CIV, 2015 WL 4077463, at *1-3 (S.D. Fla. July 6, 2015).[31]  Significantly, Plaintiffs do not point to any state court authority suggesting otherwise, and no such state court authority appears to exist.  Thus, the Estate's failure to provide the requisite notice is fatal to Count VIII of the Complaint.

---

[31] I recognize that a few decisions in the Middle District of Florida have held otherwise. *See, e.g.*, *Throw v. Republic Enter. Sys., Inc.*, No. 8:06-CV-724-T-30, 2006 WL 1823783, at *1 (M.D. Fla. June 30, 2006).  But, respectfully, they clearly erred in doing so for the reasons discussed above and for the reasons that judges in this district (and other federal judges in this state, including others in the Middle District) have announced in concluding as I do.  Notably, the decision in *Throw* does not even mention § 448.110(2).  Instead, the court simply found that the Legislature could not add the notice requirement (notwithstanding the constitutional provision allowing the Legislature to adopt appropriate implementation measures).  The court seemed to question whether the pre-suit notice requirement implemented by the Legislature is constitutional, an issue Plaintiffs do not even raise.  Moreover, though not binding, the Eleventh Circuit's 2018 decision in *Anagnos* (which was issued years after the few Middle District decisions that found differently on pre-suit notice) clearly recognizes that the measures set forth in the FMWA were adopted to implement Art. X, § 24(f) of the Florida Constitution (again, something the Legislature expressly had the authority to do).  *See* 721 F. App'x at 904.  Applying the law, it is not reasonably possible to reach any other conclusion.

**E. COUNT IX (Florida Constitution Art. 10, § 24(c) Retaliation)**

Count IX suffers from multiple issues that prevent the Estate from possibly maintaining a cause of action for wage retaliation.  The elements necessary to establish the Estate's retaliation claim are as follows: (1) the employee (Roig) engaged in protected activity; (2) the employee "subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Edgecombe v. Lowes Home Centers, L.L.C.*, 391 F. Supp. 3d 1142, 1149 (S.D. Fla. 2019) (citation omitted).[32]  Protected activity (or protected rights) in this context refers to "the right to file a complaint or inform any person about any party's alleged noncompliance with this amendment, and the right to inform any person of his or her potential rights under this amendment and to assist him or her in asserting such rights."  Fla. Const. art. X, § 24(d).

First and foremost, the Estate fails to allege ultimate facts sufficient to show that Roig possibly suffered an adverse action.  The only adverse action alleged in Count IX is that Defendants terminated Roig.  Complaint ¶ 174.  On the contrary, as is evident from other allegations of the Complaint, Roig was not terminated.  *See id.* ¶¶ 108-10.  In fact, Plaintiff has alleged that Roig died in his office at work, *id.* ¶ 108, and the Complaint does not contain a single allegation to suggest that Roig was fired.  The declarations submitted by O'Malley and Seguin also confirm that Roig was never terminated [DE 1-5 ¶ 18; DE 1-6 ¶ 15].  Moreover, in the Reply, Plaintiffs make clear that they allege Roig was effectively terminated because Defendants "killed him [thereby] caus[ing] his termination" [DE 23 at p. 11].  Putting aside the fact that Plaintiffs'

---

[32] "The Florida Constitution and [FMWA] adopt the meanings promulgated by the [FLSA]. The Eleventh Circuit has held that 'the Wage Amendment makes plain that employees receive the same protection under state law that they enjoy under the [FLSA].'" *Edgecombe*, 391 F. Supp. 3d at 1150 n.2 (quoting *Anagnos*, 721 F. App'x at 903-04).

allegations are insufficient as a matter of law to show that any one of the Defendants (or all of the Defendants) killed Roig, even if Plaintiffs had so alleged, it is simply preposterous to equate Roig's death with the adverse employment action of "termination." *Cf. Alexander v. Agilysys Inc*, 696 F. App'x 487, 490 (11th Cir. 2017) ("[I]t would be nonsensical to say that an employee was fired by Agilysys where, in reality, the employee died or voluntarily resigned.").

Plaintiffs also argue in the Motion that the denial of Roig's bonus and pay raise constitutes an adverse employment action [DE 10 at p. 19]. While this could constitute an adverse employment action, Plaintiffs do not allege this adverse action anywhere in Count IX of the Complaint, and the Court must look at the Complaint at the time of removal. *See Berber*, 760 F. App'x at 688. I note that Plaintiffs allege in the general allegations of the Complaint that Roig did not receive a bonus and pay increase in retaliation for complaining about discrimination. However, this is insufficient with respect to Count IX for two reasons. First, Plaintiffs do not allege that Roig was denied a bonus or raise due to any wage-related complaint. In other words, the Complaint does not allege a causal connection between any wage complaint and the denial of a bonus or raise. Second, as mentioned above, the *sole* adverse action alleged in Count IX itself is termination.[33]

Count IX also fails because Roig was *clearly* an exempt employee, meaning he would not have been engaged in protected activity even if he complained about his wages.[34]  *See Keith v.*

---

[33] *See Etheredge v. J.A.W. Ent., Inc.*, No. 1:19-CV-25186-Gayles, 2020 WL 5500842, at *2 (S.D. Fla. Sept. 11, 2020) ("While Plaintiff reincorporates paragraphs 1–16 into each of her counts, she fails to identify which facts are relevant to which count. It is not for the Court to discern among general allegations those which are most relevant to a particular claim or count in Plaintiff's Amended Complaint. Thus, Counts I and III of Plaintiff's Amended Complaint must be dismissed for failure to properly state a claim.").

[34] Count VIII fails for this reason as well. As discussed herein, because Roig was clearly an exempt employee, any complaint he would have made about not receiving wages for certain hours worked

*Univ. of Miami*, 437 F. Supp. 3d 1167, 1172 (S.D. Fla. 2020) ("Plaintiff as an exempt employee

was not engaged in a statutorily protected activity and cannot maintain a claim under the FLSA.").

Even when no wage or overtime violation has occurred, a plaintiff-employee may still have a

retaliation claim if the retaliation elements (protected activity, adverse action, causal connection)

are established.  However, to qualify as protected activity, the alleged complaint giving rise to the

retaliation claim must be both objectively reasonable and made in good faith (good faith being a

subjective component).  *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960

(11th Cir. 1997); *Keith*, 437 F. Supp. 3d at 1172; *Kaplan v. Burrows*, No. 6:10-CV-95-ORL-

35DAB, 2011 WL 13298585, at *5 (M.D. Fla. Mar. 8, 2011).[35]   In determining objective

reasonableness, employees are charged with substantive knowledge of the law.  *Keith*, 437 F. Supp.

3d at 1172 (citing *Padilla v. N. Broward Hosp. Dist.*, 270 F. App'x 966 (11th Cir. 2008); *Harper

v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998)).

        The FLSA and Florida law provide an exemption from minimum wage and overtime

requirements with respect to an employee "employed in a bona fide executive, administrative, or

---

would not have been objectively reasonable and, thus, would not have qualified as protected
activity.

[35] I note that *Edgecombe* quotes language from another case in this district stating that "all that is
required is a good faith belief, and a retaliation claim does not become unavailable simply because
the underlying substantive claim itself later proves to be incorrect."  391 F. Supp. 3d at 1150
(quoting *Lett v. Wells Fargo Bank, N.A. (Lett II)*, 233 F. Supp. 3d 1330, 1339 (S.D. Fla. 2017)).
In making the foregoing statement in *Lett II*, the court cited *Aery v. Wallace Lincoln-Mercury,
LLC*, 118 So. 3d 904 (Fla. 4th DCA 2013).  In *Aery*, the court stated, "all that is required is that
the 'employee have a good faith, *objectively reasonable* belief that h[is] activity is protected by
the statute.'"  118 So. 3d at 916 (emphasis added) (citation omitted).  Thus, it is evident that the
important words "objectively reasonable" were incorrectly omitted from the quote in *Lett II*.
However, as reflected above, Florida and Eleventh Circuit case law make clear that there is an
"objectively reasonable" requirement in addition to the subjective good faith requirement.  Even
in *Edgecombe*, notwithstanding the court's quotation with the language from *Lett II*, the court
made clear that the applicable two-part standard requires objective reasonableness and specifically
stated that it could not "find that Edgecombe did not have an *objectively reasonable* and good faith
belief . . . ."  391 F. Supp. 3d at 1150 (emphasis added).

professional capacity." 29 U.S.C. § 213(a)(1).[36] *See also* Fla. Const. art. X, § 24(f) ("It is intended that case law, administrative interpretations, and other guiding standards developed under the federal FLSA shall guide the construction of this amendment and any implementing statutes or regulations."); *Anagnos*, 721 F. App'x at 904 ("The Wage Act also incorporates the exemptions and restrictions in sections 213 and 214 of the Fair Labor Standards Act 'as interpreted by applicable federal regulations and implemented by the Secretary of Labor.'" (citation omitted)).

Here, the undisputed material facts clearly reveal Roig's exempt status. His status as an exempt employee is evident from the allegations of the Complaint coupled with the undisputed salary information provided by Defendants within the declarations they submitted. Plaintiff alleges that Roig was a manager who oversaw many employees in his department. Complaint ¶¶ 21-22. Even in 1999, Roig was managing a staff consisting of 1,000 employees, and following 1999, he received further promotions. *See id.* ¶¶ 40-46. In fact, in 2004, he "became division manager in charge of Miami air service operations and compliance of Central America, South America, and Caribbean gateways and Miami hub." *Id.* ¶ 46. In 2015 (the year pertaining to his wage and retaliation claims), Roig, a salaried management employee, was paid gross wages exceeding $210,000 [DE 1-3 ¶ 5; DE 20-1 ¶¶ 4, 8]. Thus, the undisputed allegations and facts make Roig's exempt status apparent. Notably, neither Plaintiffs' Motion nor Reply dispute Roig's exempt status. *Cf. Kaplan*, 2011 WL 13298585, at *6 ("Even Plaintiff appears to recognize that

---

[36] There is also an exemption for a highly compensated employee "with total annual compensation of at least $107,432" who "regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601. The compensation amount for this exemption was recently raised from $100,000 (the amount needed to qualify for this exemption during the relevant time period). Nevertheless, Roig's compensation exceeded both the current and prior threshold by a significant margin.

he was an exempt employee under the FLSA, as his Response fails to address the Defendant's arguments in this regard.").

In support of their argument regarding Roig's exempt status and its concomitant effect on the Estate's ability to maintain a wage retaliation claim, Defendants rely on various cases including *Kaplan*, which I find to be persuasive. In *Kaplan*, the court found that the plaintiff-employee who received an annual salary of $160,000 was an exempt employee. *Id.* at *5-6. Based on his salary and his duties, the court found that the plaintiff-employee's claim that he was protected by the FLSA, even if subjectively held, was "patently unreasonable." *Id.* The court further stated:

> A complainant can be wrong in his assertion of an FLSA violation but still raise an objectively reasonable complaint, particularly where the claim at issue is suffused with uncertainty because the state of the law is in flux or because the factual peculiarities surrounding the case pose a novel legal question. This is not that sort of matter. This case involves a high-level executive complaining about his entitlement to minimum wage while under contract to earn $160,000 per year. Because Plaintiff was not a protected individual under the FLSA at the time he lodged his complaint and could not have reasonably believed he was a protected employee and, therefore, engaged in protected activity at that time, the Court finds that Plaintiff has failed to establish a prima facie case for retaliation.

*Id.* at *6. *See also Keith*, 437 F. Supp. 3d at 1173 ("Where, as here, Plaintiff was explicitly exempt and therefore not covered by the FLSA, the court concludes no reasonable employer, given the context and content, could have perceived her complaint as a genuine assertion of rights under the FLSA. . . . Moreover, Plaintiff points to no case, and the Court has not on its own identified any, in which an employee clearly and explicitly exempted from FLSA coverage has successfully raised an FLSA retaliation claim."). Like the plaintiff-employee in *Kaplan*, Roig was a high-level management employee, and he earned a salary even greater than the plaintiff-employee in *Kaplan*. Additionally, as in *Kaplan*, the state of the law is not in flux with respect to Roig's status as an

exempt employee.  Thus, it is not possible to satisfy the reasonable, objective component, rendering the Estate's retaliation claim impossible.[37]

In sum, the Complaint and declarations make clear that Roig was not terminated, and Count IX fails to allege any other adverse employment action (specifically not one that is causally related to any wage-related complaints).  Moreover, any wage complaints by Roig were not objectively reasonable because of his evident exempt status, meaning Roig did not engage in protected activity.  For the foregoing reasons, the Estate cannot possibly maintain a cause of action for wage retaliation.[38]

---

[37] Plaintiffs point to *Edgecombe* to argue that it was remanded even though Mr. Edgecombe earned almost $200,000 per year.  DE 23 at 11.  As an initial matter, *Edgecombe* involved three plaintiffs with salaries of $114,031.59, $82,720.00, and $65,561.60, 391 F. Supp. 3d at 1148, so it is unclear on what Plaintiffs' reference to $200,000 relies.  In any event, *Edgecombe* did not involve any argument that Mr. Edgecombe or the other employees were clearly exempt.  *Keith* and *Kaplan*, however, did involve exemption-based arguments in the wage retaliation context.

[38] Though Count IX clearly fails for the reasons discussed above, there are two additional issues that are worth briefly noting:

(1) The allegations regarding Roig's wage complaints are conclusory.  O'Malley and Seguin respond to those allegations by declaring that Roig never made any wage-related complaints to them.  *See* DE 1-5 ¶ 17; DE 1-6 ¶ 13.  Plaintiffs attempt to challenge those assertions through Olivera's declaration [DE 10-1] and an email attached thereto [DE 10-1 at p. 12].  Specifically, in the Motion, Plaintiffs point to paragraph 8 of the Olivera declaration and to the aforementioned email, arguing that the email contained Roig's alleged written complaint.  *See* DE 10 at p. 19; DE 23 at p. 11.  However, there are two significant problems with Plaintiffs' attempt to rely on this email as Roig's alleged written complaint.  First, the email does not appear to constitute a wage complaint at all.  Second, the email (dated August 20, 2015) precedes the alleged wage violation.  Although Counts VIII and IX reference wage complaints made during Roig's last three years of employment, the allegations of ultimate fact contained in the Complaint appear to pertain to the non-payment of wages while Roig underwent treatment from late September 2015 to late October 2015 (following the August 2015 date of the email).  *See* Complaint ¶¶ 97, 168, 173.  *But see id.* ¶ 116 (generally referencing non-payment "[d]uring several weeks in 2014-16").

(2) It is undisputed that Roig received his entire 2015 salary, including for the time during which the Estate claims he did not.  The only dispute pertains to the form in which he received it – he received it in the form of short-term disability benefits.  If Roig were entitled to further wages on top of that, he would effectively be collecting double salary.  In essence, Roig's actual complaint

### F.  AMOUNT IN CONTROVERSY

Judicial experience and common sense leave me with no doubt that the amount in controversy – particularly between Plaintiffs and UPS – is more than $75,000.  *See Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 (11th Cir. 2010) ("Put simply, a district court need not suspend reality or shelve common sense in determining whether the face of a complaint . . . establishes the jurisdictional amount. . . . Instead, courts may use their judicial experience and common sense in determining whether the case stated in a complaint meets federal jurisdictional requirements." (internal citations and quotation marks omitted)).  The Notice of Removal paints a convincing picture that the amount in controversy exceeds $75,000 [*see* DE 1 at pp. 22-26], and the face of the Complaint likewise reveals that the amount in controversy very likely exceeds $75,000.[39]  *See Roe*, 613 F.3d at 1062-63 ("The defendant may meet its burden 'by establishing that it is 'facially apparent' that the claims *probably* exceed $75,000.'" (emphasis added) (citation omitted)).

In the Motion, Plaintiffs simply argue in passing that "Defendants have failed to carry their burden, but rather put forth speculation" [DE 10 at p. 18].  The Eleventh Circuit rejected a similar argument in *Roe*, where it found, as I do, that judicial experience and common sense revealed a claim value above the minimum jurisdictional amount.  *See* 613 F.3d at 1060-66.  Moreover, though not necessarily dispositive on its own, Defendants aptly point out that in the civil cover

---

is not that he did not receive his wages (minimum or otherwise) but rather that he worked unnecessarily when he was entitled to solely focus on ameliorating his disability.  Nevertheless, the Court need not decide which party is legally correct on this issue because both Counts VIII and IX clearly fail for other reasons.

[39] The counts asserted against just UPS seek various damages including, *inter alia*, back pay, front pay, compensation for lost future earnings capacity, and punitive damages.  Common sense dictates that someone holding Roig's position (as described in the Complaint) at a company like UPS, who has worked for the company for over thirty years, receives an annual six-figure salary.  As it turns out, Roig received gross wages in 2015 that exceeded $210,000 [DE 1-3 ¶ 5].  Thus, considering the types of damages Plaintiffs are seeking (even looking at the counts against only UPS), I have no question that the amount in controversy requirement is satisfied.

sheet, Plaintiffs themselves estimated the value of their claims to approximate $250,000 [*see* DE 20 at p. 3; DE 1-2 at p. 2].

**IV.**  **CONCLUSION**

For the reasons discussed above, I **recommend** that the District Court **DENY** the Motion [DE 10].

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 30th day of September 2020.

Jared M. Strauss
**United States Magistrate Judge**